64 F.3d 669
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Pete GARCIA, Plaintiff-Appellee,
v.
James Brad JOHNSON, Deputy; Kevin Cartica, Deputy; John
Noth, Deputy; G. Grainger, Deputy; F. Greenberg, Deputy;
R. West, Deputy; Robert Vette, Investigator, and as police
officers in the Jefferson County Sheriff's Department; B.
Williams, Douglas Moore, and as deputy sheriffs in the
Jefferson County Sheriff's Department, Defendant-Appellants,
JEFFERSON COUNTY SHERIFF'S DEPARTMENT; Anthony Datillo, Defendants.
 No. 94-1360.
(D.C.No. 93-N-2110)
 United States Court of Appeals, Tenth Circuit.
 Aug. 18, 1995.
 
 1
 Before TACHA and BRORBY, Circuit Judges, and BROWN.[2]
 
 ORDER AND JUDGMENT[1]
 
 2
 Pete Garcia filed a 1983 action against the Jefferson County, Colorado, Sheriff's Department SWAT team and its members claiming the SWAT team violated his constitutional rights. The defendants filed a motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the case for failure to state a claim. This motion was based upon qualified immunity. The district court denied the Rule 12(b)(6) motion to dismiss. The defendants appeal.
 
 BACKGROUND
 
 3
 The well-pleaded facts, which we accept as true given the procedural posture of this appeal, see Gagan v. Norton, 35 F.3d 1473, 1474 n. 1 (10th Cir.1994), cert. denied, 115 S.Ct. 1175 (1995), in Mr. Garcia's second amended complaint reveal the following.
 
 
 4
 On March 26, 1987, plaintiff Pete Garcia was visiting his mother's home in Jefferson County, Colorado, to do some construction work on the house. Pete Garcia's brother, Alger Garcia, lived at his mother's home at this time and was present on March 26. Unbeknownst to either Pete or Alger Garcia, the Jefferson County Sheriff's Department was engaged in an undercover drug investigation of Alger Garcia. Pete Garcia was never a target of this investigation.
 
 
 5
 Part of the investigation of Alger Garcia involved at least three hand-to-hand drug sales over a one-month period from Alger Garcia to an undercover informant who was working for the Sheriff's Department. Based on these undercover buys, the Sheriff's Department applied to a Jefferson County Court for a "no-knock" search warrant for the Garcia residence in Jefferson County and an arrest warrant for Alger Garcia. Both warrants were ultimately issued on March 26, 1987.
 
 
 6
 In order to effectuate the "no-knock" search warrant, the services of the Jefferson County Sheriff's Department SWAT team were utilized. The SWAT team decided on a course of action for the execution of the search warrant. Due to their concern that Alger Garcia might have access to firearms, the officers agreed that the overriding principle for executing the warrant would be secrecy. Part of this plan of secrecy included wearing camouflage clothing with no conspicuously visible marks identifying the officers as law enforcement personnel.
 
 
 7
 Ultimately, the officers decided to execute the warrant at 2:00 a.m. on March 27, 1987, and they devised two different plans. The first plan was to surround the premises and then place a telephone call to Alger Garcia telling him to exit the house with his hands up. The second plan was a so-called "dynamic entry" plan in which the officers would break down the door to the house, storm the premises, and announce that they were police officers and that they were executing a warrant for Alger Garcia. Part of the dynamic entry plan involved the use of a stun grenade to shock and disorient the individuals inside the residence.
 
 
 8
 With these two plans in mind, the SWAT team departed for the Garcia residence at approximately 1:30 a.m. When the officers approached the residence, Pete Garcia's two dogs, which were chained to a dog house outside the front door of the residence, began barking. As the officers continued toward the house, the dogs began barking more loudly. This concerned the officers as they felt the barking posed a threat to the execution of the warrants. Based on this unexpected situation, the head of the SWAT team decided to use the dynamic entry plan. Using the dynamic entry plan, the officers tossed a stun grenade into the residence as a diversionary tactic.
 
 
 9
 The grenade exploded loudly, and it stunned and woke Pete Garcia who was sleeping inside the house. At this juncture, no member of the SWAT team shouted "police" or otherwise identified himself as a law enforcement officer. Immediately after the stun grenade went off, two officers approached the residence to enter through the front door where the two dogs were chained up. The officers approached the animals and because the dogs were impeding their access to the residence, they shot and killed the two animals. By this time, the commotion had woken Pete Garcia, and he had raced to the window to observe two individuals in camouflage clothing shoot his dogs. He did not know they were police officers, because they had not announced their presence or identified themselves as officers.
 
 
 10
 As a result of seeing strangers shoot his dogs, Pete Garcia ran downstairs and exited through the rear of the house. As he exited, he heard the sound of shotgun fire. He was immediately confronted by an individual, dressed in dark clothing, who told him to get on the ground. The individual then kicked him in the back and tied his hands with a rope. Pete Garcia still did not know these individuals were law enforcement personnel. The officer then dragged Pete Garcia to his feet, turned him so he was facing the wall, and forcefully carried him around the house while keeping his face and bare chest to the wall and a gun to his head. The officer was using Pete Garcia, in essence, as a shield against any gunfire that might come through one of the windows.
 
 
 11
 As Pete Garcia was being dragged to the front of the house, he heard a muffled shotgun blast from inside the house, at which time he realized his brother was still inside and alive. Pete Garcia then saw the "bare outline" of a Jefferson County Sheriff's Department patch on the officer's sleeve, prompting him to yell to Alger Garcia that the individuals were police officers and that Alger should come out of the house. At that point, Pete Garcia heard one of the officers announce, for the first time, that they were in fact the police.
 
 
 12
 After the two officers had killed the dogs, they attempted to break down the front door. When their efforts to break down the door failed, one officer went to the window next to the door and attempted to break it with his revolver. He did not know, however, that the wall immediately opposite the window inside the house had large mirrors on it. When the officer looked inside the window, he saw his own reflection. This caused him to panic and begin firing into the window at his own reflection. Immediately thereafter, the other officers opened fire. It was later determined that an excess of 200 rounds of ammunition were fired into the Garcia residence during the execution of the search warrant.
 
 
 13
 Eventually, one of the officers entered the house and began firing with an automatic weapon. The sound of gunfire inside the residence prompted Alger Garcia to fire one shotgun blast in the direction of the doorway where the officer had been shooting his automatic weapon. Alger Garcia's shotgun blast hit the officer in the shoulder and neck. Another officer also was hit by an unidentified blast during the shoot-out.
 
 
 14
 Pete and Alger Garcia were subsequently placed in custody and taken to the Jefferson County jail. Despite repeated protestations of his innocence, Pete Garcia was placed in solitary confinement where he remained for a period of just under nine months. In an effort to cover up the SWAT team's miscalculations and mistakes in executing the search warrant, the officers prepared false police reports to influence the prosecutors to charge Pete Garcia with two counts of attempted murder, two counts of first degree assault on a police officer, and two counts of committing a crime of violence. Each of these charges related to the shooting injuries of two of the officers. The falsities put in the reports were that Pete Garcia was a suspect in an undercover drug investigation, that the officers announced or identified themselves as police prior to being shot at by the Garcia brothers, and that Pete Garcia had conspired with his brother Alger. According to Mr. Garcia's complaint these "false statements were critical and material since there could have been no attempted murder charge or assault on a police officer charge unless the Garcias heard or were notified that the police were present before any shots were fired."
 
 
 15
 The complaint further alleges that the extent of this cover-up plan went beyond the filing of the false police reports. Four of the officers provided false testimony at Mr. Garcia's preliminary hearing on the question of whether prior to any gunfire they had announced they were law enforcement officers. This testimony was subsequently relied upon by the judge in making the finding that there was in fact probable cause to bind Pete Garcia over for trial on the charges set forth above.
 
 
 16
 Despite his repeated protests that he was innocent and that there was no probable cause to initiate or pursue criminal prosecution against him, Pete Garcia, nine months after his arrest, agreed to plead guilty to one count of accessory to first degree assault in exchange for dismissal of the remaining charges. The state court judge accepted his plea and sentenced him to four years of probation. See People v. Garcia, 799 P.2d 413, 414 (Colo.App.1990). Mr. Garcia subsequently filed a motion to withdraw his plea, however, claiming he had received ineffective assistance of counsel.[3] The Colorado Court of Appeals agreed that Pete Garcia had received ineffective assistance of counsel and allowed him to withdraw his plea. Id. at 415-16. By a four to three vote, the Colorado Supreme Court affirmed this decision. See People v. Garcia, 815 P.2d 937, 938 (Colo.1991), cert. denied, 502 U.S. 1121 (1992).
 
 
 17
 On February 26, 1993, Pete Garcia withdrew his guilty plea. The same day, the State of Colorado moved for the dismissal of all charges against Pete Garcia, and the motion was granted. As a result, all the criminal charges and proceedings brought against him, stemming from his March 27, 1987 arrest, were resolved in his favor.
 
 
 18
 Pete Garcia then filed the present complaint in federal
 
 
 19
 district court in Colorado asserting claims under 42
 
 
 20
 U.S.C.1983 against the Jefferson County Board of County
 
 
 21
 Commissioners and the nine officers in their individual
 
 
 22
 capacities. (Id., doc. 9 at 4.) He alleges three claims for
 
 
 23
 relief: (1) conspiracy to commit malicious prosecution;
 
 
 24
 (2) malicious prosecution; and (3) false arrest. The
 
 
 25
 defendants filed a Rule 12(b)(6) motion claiming qualified immunity.
 
 DISCUSSION
 Qualified Immunity
 
 26
 The doctrine of qualified immunity "protects public officials from individual liability in a 1983 action unless the officials violated 'clearly established ... constitutional rights of which a reasonable person would have known.' " Workman v. Jordan, 32 F.3d 475, 478-79 (10th Cir.1994) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)), cert. denied, 115 S.Ct. 1357 (1995). When a government official raises the affirmative defense of qualified immunity, the determination of whether the official is entitled to immunity is controlled by our well-defined burden shifting analysis. See, e.g., Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir.1995).
 
 
 27
 The first aspect of that burden requires the plaintiff to demonstrate the defendant's actions violated a federal constitutional or statutory right. See id. Then, the second part of the burden requires the plaintiff to show with specificity that the federal right allegedly violated was clearly established at the time of the conduct at issue. Id. at 1534-35. The plaintiff need not demonstrate that "the very action in question [has] ... previously been held unlawful," instead, "the unlawfulness must be apparent' " in light of the preexisting law. Id. at 1535 (citation omitted).
 
 
 28
 If the plaintiff fails to carry either part of the burden, then the defendant is entitled to qualified immunity. Id. If, however, the plaintiff successfully carries its burden, then "the normal burden of the movant for a motion to dismiss falls again upon the defendant." Workman, 32 F.3d at 479. The district court must deny the motion to dismiss unless the defendant can demonstrate that the plaintiff could prove no set of facts entitling it to relief. Ash Creek Mining Co. v. Lujan, 969 F.2d 868, 870 (10th Cir.1992).
 
 
 29
 To understand the scope of our review of the qualified immunity defense in this case, it is necessary to understand the requirements of Rule 12(b)(6) and of notice pleading. Fed.R.Civ.P. 12(b)(6) provides for the dismissal of a complaint if the complaint fails to state a claim on which relief may be granted. Although defendants are allowed to raise the defense of qualified immunity in a Rule 12(b)(6) motion to dismiss, Workman v. Jordan, 958 F.2d 332, 334 n. 2 (10th Cir.1992), a motion to dismiss is limited to the pleadings. A motion under Rule 12(b)(6) tests the formal sufficiency of the statement of the claim for relief. 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, 1356 at 294. Unless the motion is treated as a motion for summary judgment, see 12(b)(6) & 56, the court is limited to the pleadings to determine if the petitioner has stated a cause of action. The court is limited to reviewing the well-pleaded allegations contained in the four corners of the complaint. See Gagan, 35 F.3d at 1474 n. 1 & 1475. We must accept the allegations of the complaint as true. Id.
 
 
 30
 The Federal Rules of Civil Procedure require the complaint contain only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a). The claim shall be pleaded simply, concisely, and directly. Rule 8(e)(1). This method of pleading--notice pleading--need not go beyond the concise assertions.
 
 Mr. Garcia's Claims
 
 31
 Mr. Garcia first claims that he was maliciously prosecuted and that the defendants conspired to maliciously prosecute him. He claims the defendants prepared false reports to convince prosecutors to charge him and, at the preliminary hearing, provided false testimony, which formed the basis of the court's determination that there was probable cause to arrest him. The Colorado Supreme Court has recognized a common law cause of action for malicious prosecution. See, e.g., Sancetta v. Apollo Stereo Music Co., 616 P.2d 182, 183 (Colo.App.1980). In this case, however, Mr. Garcia is seeking to redress his allegations of malicious prosecution not as a state law tort, but rather, as a so-called "constitutional tort" via 1983. See Johnson v. Jones, --- U.S. ----, ----, 115 S.Ct. 2151, 2153 (1995). Mr. Garcia can only maintain this claim if the allegations in his complaint rise to the level of a constitutional violation. See Baker v. McCollan, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.").
 
 
 32
 The Tenth Circuit has recognized that claims for malicious prosecution may occasionally arise under 1983. See, e.g., Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423 (10th Cir.1984); Norton v. Liddell, 620 F.2d 1375 (10th Cir.1980). Furthermore, the Supreme Court has clarified that a plaintiff may pursue a claim of malicious prosecution under 1983 but that the plaintiff's only constitutional remedy is under the Fourth Amendment. Albright v. Oliver, --- U.S. ----, ----, 114 S.Ct. 807, 813 (1994) (plurality). The Court concluded if malicious prosecution is committed by state actors and results in the arrest or other seizure of the criminal defendant, there is an infringement of liberty, but this does not state a 1983 claim for violation of substantive due process. Id. at 813-14.
 
 
 33
 Mr. Garcia's complaint alleges the defendants' conduct violated his "constitutional federal right not to be subjected to malicious prosecution." If the facts in his complaint are true, the defendants have violated Mr. Garcia's clearly established constitutional rights under the Fourth and Fourteenth Amendments.
 
 
 34
 Mr. Garcia's next claim alleges the defendants were not justified in detaining and incarcerating him after his brother, the target of the search and the subject of the arrest warrant, surrendered to the officers. We interpret this claim as raising two distinct claims: wrongful arrest stemming from his arrest at his mother's home and false imprisonment stemming from his subsequent detention for nine months. We address each claim in turn.
 
 
 35
 With respect to wrongful arrest, the constitutional right allegedly infringed is again Mr. Garcia's Fourth Amendment right to be free from unreasonable seizures. See U.S. Const. Amend. IV. The question then becomes whether Mr. Garcia has demonstrated the officers' conduct in arresting him during the execution of the search and arrest warrants violated the clearly established law governing warrantless arrests.
 
 
 36
 Our recent decision in Romero v. Fay delineates the applicable legal framework of our inquiry. 45 F.3d 1472 (10th Cir.1995).
 
 
 37
 A police officer may arrest a person without a warrant if he has probable cause to believe that person committed a crime. "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."
 
 
 38
 Id. at 1476 (quoting Jones v. City & County of Denver, 854 F.2d 1206, 1210 (10th Cir.1988)). In the context of a 1983 action, the defendant-officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest Mr. Garcia. Hunter v. Bryant, 502 U.S. 224, 227 (1991). The standard is whether the officer could reasonably have reached this conclusion and not whether this conclusion was in fact correct. See id. ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present' are entitled to immunity.").
 
 
 39
 In this case, the defendants-officers sought to execute a valid "no knock" search warrant for the Garcia premises and a valid arrest warrant for Alger Garcia. In attempting to execute those warrants under a shroud of secrecy, the defendants shot and killed Pete Garcia's two dogs. The gunfire startled Mr. Garcia and caused him to run downstairs and exit the residence through the rear door, at which time he was detained by one of the officers. Shortly thereafter, he called to his brother and told him to come out and surrender. The question thus posed is whether the conduct of the officers in detaining Pete Garcia after Alger Garcia had surrendered constituted a wrongful seizure. More specifically, the question is whether a reasonable officer could believe there was probable cause to arrest Pete Garcia for the attempted murder or assault of the officers. Based upon Mr. Garcia's complaint, the officers did not have probable cause to make this arrest, and therefore, the defendants are not entitled to qualified immunity.
 
 
 40
 The second aspect of this claim relates to Mr. Garcia's imprisonment for nine months following his arrest. This is a claim based on the constitutional tort of false imprisonment. A plaintiff may maintain a "claim for false imprisonment in violation of 1983 by specifically alleging facts that show a government official acted with deliberate or reckless intent to falsely imprison the plaintiff." Romero, 45 F.3d at 1480. According to Mr. Garcia's allegations, the officers falsified the police reports and then falsely testified against him.
 
 
 41
 Mr. Garcia has sufficiently pled false imprisonment in violation of the Fourteenth Amendment. See Webber v. Mefford, 43 F.3d 1340, 1343 (10th Cir.1994) ("[A] government official violates an individual's Fourteenth Amendment rights by injuring his or her life, liberty, or property interest with deliberate or reckless intent."). Thus, the district court did not err in denying the defendants qualified immunity on their motion to dismiss.
 
 CONCLUSION
 
 42
 In this case, defendants chose to test the sufficiency of the pleadings, particularly in reference to their claim of qualified immunity. We have reviewed the complaint utilizing the time honored rules for so doing, i.e., assuming the truth of all well-pleaded allegations and giving the pleader the benefit of all reasonable inferences. We specifically note the defendants chose not to test the sufficiency of Mr. Garcia's facts via the summary judgment route. While our case law permits defendants to raise the defense of qualified immunity in a motion to dismiss, litigants should not lose sight of the different rules governing summary judgment.
 
 
 43
 Mr. Garcia has adequately stated constitutional violations, and the defendants have failed to demonstrate that Mr. Garcia could prove no set of facts entitling him to relief. Thus, we AFFIRM and REMAND for further proceedings.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 The Honorable Wesley E. Brown, Senior United States District Judge, District of Kansas, sitting by designation
 
 
 [3]
 Specifically, he alleged trial counsel advised him, contrary to Colorado law, that a plea of guilty would not affect his ability to pursue civil litigation against the defendants based on what he believed to be his wrongful arrest and incarceration. Id