**John H. MARRS, Plaintiff,**

v.

**Shon P. BOLES, and Curtis L. Odle, Sr., Defendants.**

**No. 96–CV–1079–MLB.**

United States District Court, D. Kansas.

July 15, 1998.

John H. Marrs, Stafford, KS, pro se.

Allen G. Glendenning, Watkins, Calcara, Rondeau, Friedeman, Bleeker, Glendenning & McVay, Great Bend, KS, for Defendants.

### *MEMORANDUM AND ORDER*

BELOT, District Judge.

This matter comes before the court on cross-motions for summary judgment (Docs. 65 & 74). The parties have filed various documents in support and opposition to the motions (Docs. 75, 76, 77 & 78). For the reasons stated below, the court grants the motion of defendants Boles and Odle (Doc. 74), and denies the motion of Marrs (Doc. 65). These rulings dispose of the case and render unnecessary a decision on Marrs' pending motion to exclude evidence (Doc. 64).

### I. *NATURE OF THE CASE*

This is a false arrest action pursuant to 42 U.S.C. § 1983. Marrs alleges that the two defendants, police officers for the City of Hoisington, Kansas, arrested him without probable cause, in violation of the Fourth Amendment to the U.S. Constitution (Pretrial Order, Doc. 67 at 1). The court has jurisdiction pursuant to 28 U.S.C. § 1331.

### II. *STANDARDS GOVERNING SUMMARY JUDGMENT*

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986). The court's inquiry is to determine "whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably

find for the non-moving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993). This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. Once the moving party properly supports its motion, the non-moving party "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993). The court reviews the evidence in the light most favorable to the non-moving party, *e.g., Thrasher v. B & B Chem. Co.,* 2 F.3d 995, 996 (10th Cir.1993), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514, 91 L.Ed.2d at 216.

## III. *STATEMENT OF FACTS*

Shortly after 6:00 P.m. on March 31, 1994, Marrs, his wife Dorothy, and his friend Dean Hazelton went to the American Legion in Stafford, Kansas for dinner (Defs. Fact ¶¶ 1; Doc. 75, Marrs Depo. at 13–14). While eating dinner, Marrs "drank two beers" (Doc. 75, Trial Tr. at 121 (Marrs) & Marrs Depo. at 13–14).[1] After dinner, the three left in separate vehicles; Hazelton and Marrs for their respective homes and Dorothy Marrs for her shop (Doc. 75, Marrs Depo. at 17). Marrs drove his tan and brown Chevrolet pickup (*id.* at 19). Marrs' route would take him by Hazelton's home, and as he approached Hazelton's home, Hazelton flagged him down (Defs. Fact ¶ 3).

Christina Bunker, a resident of Stafford, called 911 dispatch at 8:52 p.m. to report an intoxicated, male driver in a two-tone Chevy pickup truck on the 100 block of North Boston Street (Defs. Fact ¶¶ 4, 5, & 9; Trial Tr. at 60 & 64 (Boles)). At 8:54 p.m., Boles arrived on Boston Street, saw the Marrs' pickup truck being driven by a female, and stopped it (*id.* ¶ 6; Trial Tr. at 65). Dorothy Marrs was the sole occupant and driver. After a brief stop, Boles allowed Dorothy Marrs to proceed (*id.*).

At 8:57 p.m., Odle joined Boles. The two then drove to the house from which Bunker placed the 911 call (Defs. Fact ¶ 8; Trial Tr. at 67 (Boles)). It was the residence of Deborah Hoss, Bunker's mother. Bunker, Hoss, and several children were there (Trial Tr. at 67–68). Hoss' home was across the street from Hazelton's home (Doc. 75, Hoss Depo., Depo. Ex. 1).

Hoss and Bunker told defendants the following story: Immediately before Bunker placed the 911 call, the two had seen a two-tone brown and tan pick up truck turn off of Camden Street onto Boston. The truck was being driven by John Marrs. Marrs stopped in the middle of the street and attempted to back his truck up to the curb. In the process, he narrowly missed a parked vehicle and drove up over a curb. Apparently giving up on the idea of backing up to park, Marrs pulled forward and parked on the opposite side of the street facing the wrong direction. Marrs then "staggered" to the door of Hazelton's house. Finally, Dorothy Marrs ran over to Hazelton's house to pick up Marrs' truck and started to drive off in it before being stopped by Boles. (Defs. Fact ¶¶ 10–13; Doc. 75, Hoss Depo., Hoss Depo. Ex. 1; Doc. 75, Bunker Depo. at 6 & 15.)[2]

---

1. In his confrontation with the defendants immediately prior to his arrest, Marrs apparently admitted that he had been drinking at the American Legion (Doc. 65, 1st Ex. 2. (Typed Report of Odle); 2d Ex. 2 (same)).

2. At the time of her Nov. 12, 1996 deposition, Hoss had known Marrs for 17 or 18 years and could easily recognize him, though there is no indication in the record that she communicated this familiarity to defendants (Doc. 75, Hoss Depo. at 4; Doc. 75, Marrs Depo. at 38). Similarly, Bunker knew Marrs very well by

While he contests their version of events in this case, Marrs himself is of the opinion that Hoss and Bunker "were about as believable as anyone in town" (Defs. Fact ¶ 15; Doc. 75, Marrs Depo. at 39).

While "Boles was finishing up with the witnesses, [Odle] went across the street and" started to knock on the door of the Hazelton residence (Trial Tr. at 9 (Odle); Defs. Fact ¶ 16). Marrs and his wife came out, and Odle asked Marrs to follow him across the street. Marrs consented and the three walked across the street and stood by a patrol car (*id.* at 9 & 11 (Odle); Doc. 75, Marrs Depo. at 51 (differing slightly, but nevertheless consistent)). Odle told Marrs that Marrs could have run over the children when he turned onto Boston from Camden (Doc. 75, Trial Tr. at 51 (Marrs)). Marrs replied that "there weren't no children playing on the corner when" he came around it (*id.*). As they conversed, Odle smelled alcohol on Marrs' breath and noticed that Marrs had bloodshot eyes, poor balance, and slurry speech (Defs. Fact ¶ 17; Trial Tr. at 11 & 16 (Odle)). During the interview, Marrs was loud, argumentative, uncooperative, and rude, repeatedly calling Odle (and later also Boles) "sons of bitches" and saying "fuck you" (Defs. Fact ¶¶ 19 & 20; Trial Tr. at 12 (Odle) & 71 (Boles); Doc. 75, Marrs Depo. at 60, 62–63). At some point, Boles joined the group (Trial Tr. at 15 (Odle) & 70 (Boles)). Defendants repeatedly asked Marrs to refrain from using profanity because children were present, but Marrs ignored their pleas (Defs. Fact ¶¶ 20–21). Boles and Marrs were standing quite close to one another when Marrs, holding a burning cigarette, swung his hands in such a way that the cigarette came within a few inches of Boles' eye (Defs. Fact ¶ 22; Trial Tr. at 15–16 (Odle) & 73–74 (Boles) & 121 (Marrs)). At that point, Boles placed Marrs under arrest for disorderly conduct (Defs. Fact ¶ 24; Trial Tr. at 16 (Odle)). Odle immediately advised Marrs that he was also under arrest for drunken driving and child endangerment.

According to Odle, the conversation lasted ten to twelve minutes (Trial Tr. at 15 (Odle)). According to Marrs, it lasted thirty to forty minutes (Doc. 75, Marrs Depo. at 60). When Marrs had been transported to the police station, he was given, and failed, a field sobriety test (Trial Tr. at 16 (Odle)). He then failed a Preliminary Breath Test (Defs. Fact ¶ 25; Trial Tr. at 26 (Odle)). Defendants then transported Marrs to Stafford Hospital for a blood alcohol test (Trial Tr. at 27 (Odle)). The hospital reported his blood alcohol content to be .21 (Defs. Fact ¶ 28; Doc. 75, Marrs Depo. at 63).

Marrs' version of the facts is that he left the American Legion—sober—shortly after 7 p.m., driving his truck and heading home (Doc. 75, Marrs Depo. at 14, 17 & 19). As he was driving down Boston Street toward home a few minutes later, Hazelton flagged him down (*id.* at 21). He attempted to pull into Hazelton's driveway, but a parked car partially blocked it and a moving van had parked on the other side, which left Marrs with too little room to complete his turn (*id.* at 22). Marrs straightened out his wheels, backed up, and parked along the curb facing oncoming traffic. He spent the next hour plus at Hazelton's place guzzling beer. While he was admittedly drunk, he claims he did not become drunk until arriving at Hazelton's house (Defs. Fact ¶ 18; Doc. 75, Marrs Depo. at 51 & 60). The arrest occurred about 9:40 p.m. (Doc. 65, Ex. B, Request for Admissions No. 8).[3]

## IV. ANALYSIS

◼ The Tenth Circuit has provided ample guidance on the law governing false arrest claims under 42 U.S.C. § 1983.

---

sight (Doc. 75, Bunker Depo. at 5; Doc. 75, Marrs Depo. at 37–38).

**3.** Because plaintiff is acting pro se, the court has liberally pieced together his argument from various documents.

An action for false arrest in the context of § 1983 is governed by Fourth Amendment standards premised upon the concept of probable cause. Thus, any Fourth Amendment seizure relating to an arrest is constitutionally lawful if the officer making the arrest has probable cause. Furthermore, where probable cause exists, the subjective intent of the officer in effectuating an arrest is irrelevant.[4]

*Thompson v. Limke*, No. 96–6368, 1997 WL 290956, at *2, 113 F.3d 1247 (10th Cir. May 27, 1997) (unpublished table decision) (citations omitted). Marrs' success in this litigation therefore turns "on his ability to prove either that the defendants acted without probable cause or that they purposefully concealed and misrepresented material facts to the district attorney which may have influenced his decision to prosecute. Because [the plaintiff] did not make the latter claim in his complaint, he can rely only upon the former to support his action for false arrest." *Id.*

■ "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir.1995) (quotations and citations omitted).

■ Arresting officers have qualified immunity from civil liability. *See Romero*, 45 F.3d at 1476; *Reiss v. Luchetta*, No. 94–1489, 1996 WL 87051, at *3, 78 F.3d 597 (10th Cir. Feb. 28, 1996) (unpublished table decision); *Garcia v. Johnson*, No. 94–1360, 1995 WL 492879, at *4, 64 F.3d 669 (10th Cir. Aug. 18, 1995) (unpublished table decision).

Qualified immunity protects public officials performing discretionary functions unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. The qualified immunity doctrine balances the protection of constitutional and statutory rights with the protection of public officials from undue interference in the performance of their duties as a result of baseless claims. Qualified immunity leaves ample room for mistaken judgments, protecting all but the plainly incompetent or those who knowingly violate the law. Public officials whose mistaken judgments result from unsettled law, faulty information, or exigent circumstances may thus be entitled to qualified immunity.

*Reiss*, 1996 WL 87051, at *3 (quotations and citations omitted).

When a government official raises the affirmative defense of qualified immunity, the determination of whether the official is entitled to immunity is controlled by well-defined burden shifting analysis.

The first aspect of that burden requires the plaintiff to demonstrate the defendant's actions violated a federal constitutional right. Then, the second part of the burden requires the plaintiff to show with specificity that the federal right allegedly violated was clearly established at the time of the conduct at issue. The plaintiff need not demonstrate that the very action in question [has] ... previously been held unlawful, instead, the unlawfulness must be apparent in light of the preexisting law.

---

4. Defendants suggest, based on a statement made by Marrs immediately prior to his arrest as reported by defendant Boles (Doc. 65, Ex. 1 or Doc. 75, Ex. A at 2), that Boles might have been motivated to arrest Marrs because Marrs failed to keep a promise to repair a transmission for Boles at some time in the past (Doc. 75 at 16). Marrs himself does not make this argument. The Tenth Circuit has indicated that subjective intent is irrelevant when probable cause exists. As discussed later in this opinion, the court finds that probable cause did exist. Additionally, while Boles arrested Marrs for disorderly conduct, Odle arrested him for driving under the influence and child endangerment. There is no indication that Odle's decision to arrest was colored by a vendetta of any kind.

*Garcia,* 1995 WL 492879, at *4 (quotations and citations omitted).

The Tenth Circuit could have been discussing this case when in the *Reiss* case it wrote the following passage. It is only necessary to substitute Marrs' name for Mr. Reiss and the defendants' names for Officer Luchetta.

In this case, the right asserted by Mr. Reiss is the Fourth Amendment right to be free from an arrest without probable cause. That right was clearly established at the time of Mr. Reiss's arrest. Accordingly, in resolving the qualified immunity issue, we must proceed to a more particular inquiry: based on the facts presented ..., we must determine whether, at the time that Officer Luchetta arrested Mr. Reiss, a reasonable officer could have concluded that there was probable cause to make the arrest.

*Reiss,* 1996 WL 87051, at *4; *see Romero,* 45 F.3d at 1476 ("When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is 'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff").

■ "To defeat qualified immunity on his wrongful arrest claim, Plaintiff [has] the burden at summary judgment to assert a violation of his Fourth Amendment rights." *Romero,* 45 F.3d at 1476. Marrs' contention is that "when the police officers stopped the pick-up [when his wife was driving it] and the Plaintiff was not driving, they should have not taken the word of one witness and failed to believe the Plaintiff or his wife, and also failed to talk to any other witnesses on the scene before

arresting the plaintiff" (Doc. 64 at 2).[5] Marrs' argument necessarily relates only to the driving under the influence and child endangerment charges, because the disorderly conduct charge stemmed purely from defendants' observations. Even at that however, it must fail. As explained below, the Tenth Circuit's opinion in *Romero v. Fay* requires this court to conclude that Marrs' contention fails to state a violation of his Fourth Amendment rights.

In *Romero,* the defendant officer arrested the plaintiff on suspicion of murder four and a half to five hours after the crime, based solely on the statements of two individuals. 45 F.3d at 1473–74. The two individuals did not claim to be eyewitnesses to the homicide. *Id.* The court said that "Plaintiff's burden required him to show that the statements supplied by [the witnesses] did not constitute reasonably trustworthy information sufficient to lead a prudent police officer to conclude that Plaintiff" committed the crime. *Id.* at 1476. The court said that the plaintiff failed to make such a showing. "Indeed, the record is completely silent on this point." *Id.*

As in *Romero,* the defendant officers in this case arrested the plaintiff on the basis of the statements of two individuals. In contrast with *Romero,* the two individuals here claimed to have actually witnessed two of the crimes for which he was arrested. Additionally, they claimed to have reported the crimes immediately after they occurred.[6] Assuming for the moment an absence of any other circumstances supporting defendants' belief that probable

---

5. The court will not discuss every flaw in Marrs' contention in the body of this order, but two of those flaws deserve mention here. First, there were two witnesses to Marrs' conduct, not one. Second, Marrs failed to provide any evidence of what Dorothy Marrs, his wife, said to defendants, leaving the court with no way to decide whether anything she said would have militated against a finding of probable cause.

6. Marrs' contention that he actually parked his truck in front of the Hazelton home at

7:30 p.m. (Doc. 64 at 2–3) is irrelevant, unless he can show that defendants knew it or should have known it. Even if Marrs could show, which he hasn't, that he, his wife, and Mr. Hazelton, all told the defendants that Marrs had been sober when he parked the truck in front of Mr. Hazelton's house, a reasonable police officer still could have believed he had probable cause to arrest Marrs. Police officers are fully justified in relying on the statements of non-victim eye-witnesses in preference to the statements of the accused, his spouse, and his friend.

cause existed, they have already made out a stronger case than the defendant officer in *Romero*.

As with the plaintiff in *Romero*, Marrs failed to produce any evidence that defendants should have regarded the information supplied by Deborah Hoss and Christine Bunker, the witnesses, as untrustworthy. He suggests that their credibility could have been doubted by the police because they made several 911 calls when that service first became available in their community. He provides no information about the nature, purpose, or legitimacy of the calls, nor does he provide evidence that defendants knew the witnesses had made such calls. Without more, the mere fact that witnesses have made multiple calls to 911 at some point in the past casts no doubt on their credibility. Moreover, Marrs himself admits that the two witnesses "were about as believable as anyone in town" (Doc. 75, Marrs Depo. at 39). Therefore, on the basis of the witnesses' statements alone, *Romero* compels this court to conclude that "a reasonable officer could have believed that probable cause existed to arrest" the plaintiff. *Romero*, 45 F.3d at 1476.

In this case, defendants made their decision to arrest for driving under the influence on more than simply the statements of Hoss and Bunker. Defendants spent some time speaking with Marrs before arresting him. He was verbally abusive and uncooperative.[7] He admitted having drunk beer at the American Legion; he admitted having driven his truck from the American Legion to the Hazelton residence; and he appeared (and was in fact) drunk when defendants encountered him. He implicitly admitted turning onto Boston Street from Camden when he protested that there were no children playing near that intersection when he turned the corner, thus corroborating the witnesses'

statements regarding Marrs' route. All these factors support defendants' belief that they had probable cause. The court has no difficulty concluding that a reasonable police officer could have determined that there was probable cause to arrest Marrs. Indeed, on this record the evidence establishes as a matter of law that probable cause existed to arrest Marrs for drunken driving.

Marrs suggests that defendants had a duty to question all potential witnesses or to otherwise conduct an investigation before arresting him (Doc. 78 at 1). This is a slight misstatement of the law. Before making a warrantless arrest, officers must "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all." *Romero*, 45 F.3d at 1476–77. Marrs specifically offers the names of two potential witnesses defendants could have interviewed but did not: Gail Smiley who was in her yard "a short way" from the scene and saw Marrs arrive at Hazelton's house, and Donna Hern, the waitress at the American Legion who served Marrs his dinner and drinks on the night of the arrest. There is no indication in the record that Smiley remained in her yard when defendants arrived on the scene or that defendants or even Marrs were aware that she had witnessed Marrs' arrival. There is no indication that Hern was anywhere other than the American Legion. In the absence of such evidence, the court cannot infer that defendants should have interviewed them or that defendants conducted an inadequate investigation.

■ Probable cause also existed with respect to the disorderly conduct charge. K.S.A. 21–4101 prohibits the following: "with knowledge or probable cause to believe that such acts will alarm, anger or

---

7. The court does not place exaggerated significance on this factor. Persons accused of a crime are frequently defensive, even to the point of hostility, especially when wrongfully accused. Further, while distasteful and rude, it is no crime to be disrespectful to police officers. Of course, it goes without saying that verbal abuse and obstinance frequently accompany excessive consumption of alcohol. . . .

disturb others or provoke an assault or other breach of the peace ... [u]suing offensive, obscene, or abusive language or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others." Marrs' repeated and loud use of profanity and his belligerent attitude, all in the presence of children, gave defendants probable cause to believe Marrs violated the statute.

▆▆▆▆▆ If probable cause exists as to one charged crime, whether the police had probable cause to arrest for other crimes is irrelevant.

> The arrest and detention of plaintiff was a single incident. In our view, when a peace officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, and it is immaterial that the officer may have thought, without probable cause, that the defendant was committing or had committed other offenses as well.

*Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1080 (8th Cir.1990) (quoting *Linn v. Garcia,* 531 F.2d 855, 862 (8th Cir.1976)); *Elbrader v. Blevins,* 757 F.Supp. 1174, 1179 (D.Kan.1991) (Rogers, J.). Because the court finds probable cause existed to arrest Marrs on the driving under the influence charge and on the disorderly conduct charge, it is unnecessary to discuss the evidence relating to child endangerment. The doctrine of qualified immunity insulates defendants from liability. Summary judgment must be granted in their favor.[8]

▆▆▆▆▆ Marrs' principal contention in his motion for summary judgment is that his state court acquittal on all three charges conclusively establishes that he was arrested without probable cause (Doc. 65 at 1–2). Marrs confuses the quantum of evidence necessary to establish probable cause with the quantam required to create a reasonable doubt. The existence of reasonable doubt does not translate to a lack of probable cause. *See Garcia v. United States,* No. 94–2252, 1995 WL 634164, at *1, 69 F.3d 547 (10th Cir. Oct. 30, 1995) (unpublished table decision) ("the record establishes probable cause supporting plaintiffs' arrest and prosecution as a matter of law, notwithstanding plaintiffs' ultimate acquittal"). Marrs' motion is therefore without merit.

▆▆▆▆ Marrs complains that he does not have a complete copy of the trial transcript because he cannot afford to buy one (Doc. 78 at 3). He claims he is entitled to have one furnished at court expense, but cites to no statute or case so providing. The court itself knows of no such authority. As a civil litigant, Marrs is under the same obligation as any other plaintiff to bankroll his own lawsuit. The court can furnish no relief.

Despite the court's extensive use of block quotes in this case, the court assures the parties that it gave thorough and considered attention to the arguments raised. The court is no friend to abuse of power by law enforcement agents, but no such abuse has been demonstrated on the facts. The court's resolution of the qualified immunity issue renders all other arguments moot. Therefore, they shall not be discussed.

## V. CONCLUSION

For the reasons given, defendants' motion for summary judgment (Doc. 74) shall be granted, and plaintiff's motion (Doc. 65) shall be denied. These rulings render Marrs' motion to exclude evidence (Doc. 64) moot and dispose of the case. The

---

8. The foregoing analysis was written as though Kansas' driving under the influence statute prohibits only that. As defendants point out (Doc. 75 at 7–8), the statute is broader, prohibiting the operation of a vehicle within two hours of having an elevated blood alcohol content. *See* K.S.A. 8–1567(a)(2). Given Marrs' contemporaneous admission that he drove home from the American Legion a little after 7 p.m. and the fact that the arrest occurred around 9:40 p.m. (after thirty to forty minutes of discussion according to Marrs), there is little room for an *unreasonable* doubt about the existence of probable cause.

clerk is directed to enter a judgment in accordance with this opinion.

A motion for reconsideration is neither invited nor encouraged. Any motion for reconsideration must comply with Federal Rules of Civil Procedure 59 and 60, Rule 7.3 of this court, and the standards set out in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (D.Kan.1992). They must be filed by Monday, July 27. The motion may not exceed five pages in length, including supporting arguments and authorities, regardless of the number of points raised. All responses must be filed by Monday, August 10. Responses shall be limited to three pages each. No replies may be filed. Motions for extension of these time periods will be viewed with disfavor. The filing of such a motion does not relieve the party of its obligation to meet the relevant deadline, even if the motion is not ruled upon prior to the expiration of the deadline.

IT IS SO ORDERED.